AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Middle District of Florida

| | |
|---|---|
| United States of America<br>v.<br>ALEXANDER ERIC CRAWFORD<br><br>Defendant(s) | )<br>)<br>)  Case No.<br>)        6:20-mj-1398<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __May 22, 2020__ in the county of __Orange__ in the __Middle__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a) and (b)(1)(B) | Possession with intent with distribute cocaine. |

This criminal complaint is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

_____
Complainant's signature

Kimako Finey, Special Agent
_____
Printed name and title

Sworn to before me and signed in my presence.

Date: 5/23/20

_____
Judge's signature

City and state: Orlando, Florida

LESLIE R. HOFFMAN, U.S. Magistrate Judge
_____
Printed name and title

STATE OF FLORIDA            CASE NO. 6:20-mj- 1398

COUNTY OF ORANGE

### AFFIDAVIT IN SUPPORT OF THE ISSUANCE OF A CRIMINAL COMPLAINT

Kimako W. Finey, being duly sworn, deposes and says:

1. I have been a Special Agent (SA) with the United States Department of Justice, Drug Enforcement Administration (DEA) for approximately ten years.

2. I am an investigative or law enforcement officer of the United States, within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

3. I received basic SA training at the DEA Academy located in Quantico, Virginia. I am currently assigned to the DEA, Miami Field Division, within the Orlando District Office as a member of the Enforcement Group One.

4. Prior to my current assignment with the DEA, I was a police officer within the City of Winter Park, Florida, from February 2002 until January 2010.

5. As a part of my employment with the Winter Park Police Department from May 2006 until January 2010, I was assigned to the DEA, Orlando District Office, as a Task Force Officer (TFO). Task Force Officers (TFOs) are state and local officers assigned to a federal agency. TFOs are deputized by a federal agency and duly sworn on both the state and federal level to conduct criminal investigations.

6. As a SA, I am authorized to investigate violations of federal and state laws within the Middle District of Florida and throughout the United States of

1

America, including but not limited to violations of 21 U.S.C. § 841(a)(1), the distribution and possession with intent to distribute controlled substances; 21 U.S.C. § 843(b), the unlawful use of communication facilities in committing and/or causing or facilitating the commission of a felony offense; 21 U.S.C. § 846, conspiracy to distribute and possess with intent to distribute a controlled substance; 18 U.S.C. § 1959, violent crimes in aid of racketeering; 18 U.S.C. §§ 1956 and 1957, money laundering and conspiracy to commit money laundering; 18 U.S.C. § 2, aiding and abetting the aforementioned crimes; and 18 U.S.C. § 924(c), shipping, transporting, receiving, or possessing any firearm or ammunition by a person in a prohibited category in connection with a drug violation.

7. I have experience assisting with investigations involving criminal enterprises and drug trafficking organizations, and I have spoken with other more experienced Special Agents of the DEA, as well as federally deputized TFOs, regarding these matters.

8. In my work as a SA of the DEA, I have participated in narcotics investigations during the course of which I have observed, conducted, or participated in the use of the following investigative techniques, among others: physical and electronic surveillance; searches of discarded trash; undercover activities, interviews of subjects; debriefs and interviews of informants, cooperating witnesses, cooperating defendants, and other human sources of information (hereinafter "confidential sources"); controlled evidence purchases in which drugs are purchased from persons through the use of confidential sources; and me operating in an undercover capacity,

consensual monitoring and recording of meetings and telephonic communications; review of taped conversations and records of narcotics transactions; analysis of telephone pen register data and toll records; and execution of search warrants and arrests, some of which have led to seizures of narcotics, bulk United States currency, firearms, and other contraband. I have also participated in multiple narcotics investigations involving the use of wiretaps.

9. Through my training, education, experience, and conversations with other more experienced SAs and officers, I am aware that narcotics traffickers commonly utilize cellular telephones, often registered in nominee or fictitious names, in furtherance of their drug trafficking activities. I also know that narcotics traffickers frequently have access to several cellular telephones, and that they periodically use new cellular telephones, all in an effort to avoid detection and to thwart law enforcement efforts. I have also become familiar with the manner in which illegal drugs are imported and distributed, the methods of payment used for such drugs, and the efforts of persons involved in such activity to avoid detection by law enforcement. I have also become familiar with the manner in which narcotics traffickers conduct their illegal business and the methods, language, and terms used to disguise conversations about their narcotics activities. I have learned that narcotics traffickers rarely refer to heroin, cocaine, cocaine base (also known as "crack"), marijuana, methamphetamine, or other illegal drugs expressly by name. Instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, narcotics traffickers routinely refer to drug types and quantities,

drug prices, and other illegal activities by using innocuous phrases or code words. I have learned that narcotics transactions often occur in rapid succession during short encounters between drug distributors and drug customers.

10. This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## PROBABLE CAUSE

11. I respectfully submit this affidavit in support of a criminal complaint for Alexander Eric Crawford for violating 21 U.S.C. § 841, possession with intent to distribute cocaine.

12. I first became aware of the defendant, Alexander Eric CRAWFORD, on or about May 20, 2020. At that time, I was contacted by Agent Kyle McKeever of the Orange County Sheriff's Office (OCSO). Agent McKeever informed me that he has been working with a confidential source (CS).[1]

---

[1] The Department of Homeland Security – Homeland Security Investigations (HSI) has been investigating the CS, but has not charged him federally for any offenses to date. HSI referred the CS to Agent McKeever to work narcotics cases approximately four months ago.

4

13. According to Agent McKeever, the CS informed Agent McKeever that CRAWFORD had contacted the CS through Instagram on or about May 19, 2020. CRAWFORD lives in Wisconsin. CRAWFORD had no prior relationship with the CS. However, the CS is well-known among drug dealers for being a broker who buys and resells large quantities of controlled substances in the Orlando, Florida area. The CS maintains an active Instagram page in which he flaunts his lavish lifestyle.

14. CRAWFORD initiated contact with the CS through Instagram. The CS and CRAWFORD initially communicated back and forth about various topics.

15. At one point, CRAWFORD asked the CS if he could supply CRAWFORD with "work." I know in my training and experience that "work" in this context refers to drug-dealing.

16. The CS informed CRAWFORD that he had connections who could help supply drugs to CRAWFORD, and the CS asked CRAWFORD if he meant "weed." CRAWFORD responded with a snowflake emoji. I know in my training and experience that the snowflake emoji in this context refers to cocaine.

17. The CS affirmed that he could connect CRAWFORD to a supplier in Orlando, Florida. The CS said that the product would be coming from Miami, but could be delivered and given to CRAWFORD in Orlando. CRAWFORD said he would be "down to go." CRAWFORD also sent the CS his phone number.

18. After that, the CS noted that the price would be "48 for 2. 1 is 26." In my training and experience, that means that the CS was offering two kilograms of

5

cocaine for $48,000, or one kilogram of cocaine for $26,000. In my training and experience, those are average prices for cocaine purchased from a seller with whom the buyer does not have a personal relationship.

19. CRAWFORD replied, "Ok I'll take 2." The CS responded, "I'm here anytime homey."

20. CRAWFORD and the CS then communicated through a series of FaceTime calls. The CS said that during those calls, CRAWFORD and the CS reaffirmed their agreement that the CS would introduce CRAWFORD to someone who would sell him these products. In my training and experience, CRAWFORD and the CS were referring to kilograms of cocaine. CRAWFORD sent to the CS a video of himself counting four large stacks of money.

21. At some point thereafter, CRAWFORD contacted the CS and informed him that CRAWFORD and his girlfriend were renting a car to drive to Florida.

22. On or about May 21, 2020, Agent McKeever instructed the CS to tell CRAWFORD that he (i.e. the CS) would meet CRAWFORD for lunch in Orlando.

23. Due to CRAWFORD's travel, CRAWFORD did not end up meeting with the CS until approximately 5:00 p.m. The CS brought Agent McKeever to the meeting with CRAWFORD. They met at a restaurant in Windermere, Florida.

24. The CS introduced Agent McKeever as "Eric," and identified "Eric" as the person who would sell the product to CRAWFORD. Although no one specifically referenced the product as "cocaine," "Eric" referred to it as "white gold," and CRAWFORD said something to the effect of, "Yeah, it's worth more than

6

gold." The entire conversation was carried out in veiled language so as not to reveal (in a public place) that they were discussing a drug transaction.

25. CRAWFORD expressed to "Eric" that he needed to find a way to launder his money. CRAWFORD asked "Eric" to teach him how to do so.

26. At one point during the meeting, another OCSO agent joined the meeting, posing as "D.J.," the person who would physically deliver the product to "Eric." "Eric" represented that he would then deliver the product to CRAWFORD.

27. During the meeting, "Eric" asked something to the effect of, "How many do you want?" CRAWFORD explained that because he had been spending a lot of money in recent days, he could only afford to buy "one." "Eric" informed CRAWFORD that it would cost him "twenty-five."

28. "D.J." asked whether CRAWFORD wanted "two," explaining that he had already brought "two" with him. CRAWFORD confirmed that he only wanted "one." CRAWFORD added, however, that the next time he came, he would buy "four."

29. CRAWFORD also asked "D.J." and "Eric" whether they could help him get "ketamine" or "molly." In my training and experience, both "ketamine" and "molly" refer to controlled substances that street drug dealers sell.

30. During the conversation, CRAWFORD also discussed his involvement in selling other controlled substances (including highly concentrated THC oil), and showed "Eric" and "D.J." pictures of the controlled substances he sold.

7

31. "Eric" and CRAWFORD also agreed on a time and place to meet on May 22, 2020, to complete their sale. "Eric" reminded CRAWFORD that CRAWFORD would have to show "Eric" the $25,000 in cash first. After CRAWFORD did so, then D.J. would deliver the product to CRAWFORD.

32. At some point, CRAWFORD asked whether the product was "wrapped," and "Eric" said it was. In my training and experience, cocaine is almost always wrapped in plastic when it is sold in bulk.

33. CRAWFORD also asked whether the product was "stamped," and "Eric" said it was not. In my training and experience, cocaine is often stamped with a brand when it is sold in bulk. ("Eric" said it was not stamped because he was not sure whether the brick to be delivered to CRAWFORD was stamped or not.)

34. CRAWFORD and "Eric" agreed to meet at 1:00 p.m. on May 22, 2020, at a hotel to be determined at a later time.

35. CRAWFORD also provided "Eric" with his phone number. "Eric" told CRAWFORD to call him the next morning.

36. After the meeting, OCSO agents surveilled CRAWFORD and followed him to the hotel where he was staying. Because of this, the OCSO agents knew which car CRAWFORD was driving.

37. On or about May 22, 2020, at approximately 10:12 a.m., CRAWFORD texted "Eric" and confirmed that he was still interested in completing the transaction.

38. "Eric" eventually provided an address where CRAWFORD should meet him at 1:00 p.m. They were to meet at a particular hotel near the Orlando Airport, at XXXX T.G. Lee Boulevard. "Eric" instructed CRAWFORD to text him when he arrived at the hotel.

39. At approximately 1:35 p.m., CRAWFORD called "Eric" to tell him that he had arrived. Surveilling OCSO agents also saw CRAWFORD's car pull into the parking at around the same time. CRAWFORD and a female exited the car and entered the hotel. "Eric" instructed CRAWFORD to go to the fourth floor, where "Eric" would meet him.

40. "Eric" saw CRAWFORD and his female companion as they rode the glass elevator to the fourth floor. When they arrived on the fourth floor, "Eric" waved CRAWFORD over and ushered him into Room 428. DEA and OCSO agents had previously wired Room 428 and the adjoining room so they could video and audio record events that took place in Room 428.

41. CRAWFORD asked whether the product was on its way up, and "Eric" asked to see the money. CRAWFORD's female companion handed CRAWFORD her purse, and he unzipped it and opened it to display a large stack of cash.

42. After that, "Eric" telephoned "D.J.," who came to the room. "D.J." came bearing a one-kilogram brick of cocaine, wrapped in plastic. "D.J." put the cocaine on the table near CRAWFORD. CRAWFORD then handed "Eric" a huge

stack of $100 bills. "Eric" handed "D.J." half of that stack and directed "D.J." to count his half.

43. Around the same time, CRAWFORD asked if he could touch the brick of cocaine, and "D.J." said he could. CRAWFORD picked up the brick of cocaine, and he and his female companion examined it and attempted to cut through the wrapping. CRAWFORD also commented that it appeared that the drugs had been "stepped on." In my training and experience, "stepped on" is a reference to cocaine that has been adulterated.

44. CRAWFORD asked "Eric" and "D.J." whether the brick had come from Colombia. CRAWFORD also expressed his intention to break up the product when he returned to Wisconsin.

45. CRAWFORD commented on the brand stamped on the brick and said he had seen it before in Chicago. CRAWFORD asked "Eric" and "D.J." whether they had ever "moved" anything up there before. "D.J." responded something to the effect that they had "moved it all over the place."

46. Shortly thereafter, law enforcement agents arrested CRAWFORD.

## CONCLUSION

47. Based upon the foregoing, I respectfully submit that there is probable cause to believe that on May 22, 2020, Alexander Eric Crawford possessed with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a).

Kimako Finey
Special Agent
Drug Enforcement Agency

Subscribed and sworn to before me
This 23 day of May, 2020.

The Honorable Leslie R. Hoffman
United States Magistrate Judge

11